307 F.2d 845
 BANCO NACIONAL DE CUBA, Appellant,
v.
Peter L. F. SABBATINO, as Receiver, and F. Shelton Parr,
William F. Prescott, Emet Whitlock, Lawrence H. Dixon, H.
Bartow Farr, Elizabeth C. Prescott, FabioFreyre and Helen G.
Downs, co-partners doing business as Farr, Whitlock & Co.,Appellees.
 No. 226, Docket 27268.
 United States Court of Appeals Second Circuit.
 Argued Jan. 3, 1962.
Decided July 6, 1962.
 
 Rabinowitz & Boudin, New York City (Victor Rabinowitz, Leonard B. Boudin, Michael B. Standard, Mary Kaufman, New York City, of counsel), for appellant.
 Harold L. Fisher and Ross J. DiLorenzo, Brooklyn, N.Y. (Harold L. Fisher, Brooklyn, N.Y., Joseph Slavin, New York City, of counsel), for appellee Sabbatino.
 Choate, Mitchell, Baker & Nelson, New York City (Robert L. Augenblick, Winthrop S. Emmet, New York City, of counsel), for appellee Farr-Whitlock.
 John G. Laylin, Washington, D.C., (Covington & Burling, Ky P. Ewing, Jr., R. Markham Ball, Washington, D.C., of counsel), for Cuban-American Sugar Co. and Cuban American Sugar Mills Co., amici curiae.
 Before WATERMAN, KAUFMAN and MARSHALL, Circuit Judges.
 WATERMAN, Circuit Judges.
 
 
 1
 The plaintiff, the financial agent of the Government of Cuba, appeals from a summary judgment entered in the United States District Court for the Southern District of New York, dismissing its complaint against the defendant Peter L. F. Sabbatino, the New York Temporary Receiver, who is holding the proceeds of a certain shipment of sugar, and against the defendant Farr, Whitlock & Co., the commodity broker which negotiated the sale of the sugar in this country, for the conversion of the bills of lading and the sales proceeds of this sugar shipment.
 
 
 2
 In February and July 1960, Farr, Whitlock entered into contracts with General Sugar Estates, Inc., a whollyowned Cuban subsidiary of Compania Azucarera Vertientes-Camaguey de Cuba (C.A.V.) for the purchase of Cuban sugar. C.A.V. is organized under the laws of Cuba, but over ninety per cent of its shareholders are residents of the United States. Pursuant to these contracts, between 6:00 A.M. on August 6, 1960, and 1:00 P.M. on August 9, 1960, 22,000 bags of sugar were loaded aboard the German vessel S.S. Hornfels standing offshore at the Cuban port of Jucaro. The exact distance offshore is not known.
 
 
 3
 On the first day of that loading, August 6, the Castro Government, at the seat of the government in Havana, issued Executive Power Resolution No. 1 under Law No. 851. The resolution proclaimed:
 
 
 4
 'In pursuance of the powers vested in us, in accordance with the provisions of Law No. 851, of July 6, 1960, we hereby,
 
 
 5
 'RESOLVE:
 
 
 6
 'FIRST: To order the nationalization, through compulsory expropriation, and, therefore, the adjudication in fee simple to the Cuban State, of all the property and enterprises located in the national territory, and the rights and interests resulting from the exploitation of such property and enterprises, owned by the juridical persons who are nationals of the United States of North America, or operators of enterprises in which nationals of said country have a predominating interest, as listed below, * * *'
 
 
 7
 Followed a list of the twenty-six companies to be seized, number 22 on the list being C.A.V. The purpose of Law No. 851 and the resolution of expropriation was set forth in the resolution as follows:
 
 
 8
 'WHEREAS, Law No. 851, of July 6, 1960, published in the Official Gazette of July 7, 1960, authorized the undersigned to provide, through joint resolutions, whenever they deem it advisable in order to defend the national interests, for the nationalization through compulsory expropriation, of the property or enterprises owned by physical and corporate persons who are nationals of the United States of North America, and the enterprises in which such persons have any interest or participation, even though they have been organized under the Cuban laws.
 
 
 9
 'WHEREAS, the attitude assumed by the Government and the Legislative Power of the United States of North America, of continued aggression, for political purposes, against the basic interests of the Cuban economy, as evidenced by the amendment to the Sugar Act adopted by the Congress of said country, whereby exceptional powers were conferred upon the President of said nation to reduce the participation of Cuban sugars in the sugar market of said country, as a weapon of political action against Cuba, was considered as the fundamental justification of said law.
 
 
 10
 'WHEREAS, the Chief Executive of the Government of the United States of North America, making use of said exceptional powers, and assuming an obvious attitude of economic and political aggression against our country, has reduced the participation of Cuban sugars in the North American market with the unquestionable design to attack Cuba and its revolutionary process.
 
 
 11
 'WHEREAS, this action constitutes a reiteration of the continued conduct of the government of the United States of North America, intended to prevent the exercise of its sovereignty and its integral development by our people thereby serving the base interests of the North American trusts, which have hindered the growth of our economy and the consolidation of our political freedom.
 
 
 12
 'WHEREAS, in the face of such developments the undersigned, being fully conscious of their great historical responsibility and in legitimate defense of the national economy are duty bound to adopt the measures deemed necessary to counteract the harm done by the aggression inflicted upon our nation.'
 
 
 13
 After August 6 the consent of the Cuban government was required before sugar-carrying ships could leave Cuban waters. To obtain this consent, on August 11 Farr, Whitlock entered into contracts with Banco Para el Commercio Exterior de Cuba, as the representative of the Castro government. The terms of these contracts were identical with those in the earlier contracts between Farr, Whitlock and the subsidiary of C.A.V. With he permission of the Cuban regime the sugar-laden S.S. Hornfels sailed for its destination, Casablanca, Morocco.
 
 
 14
 Banco Para el Commercio Exterior assigned the bills of lading for this sugar shipment to the plaintiff, which in turn sent them to Societe Generale, a French bank which acted as the plaintiff's agent in New York. The plaintiff instructed Societe Generale to deliver the bills of lading and a sight draft in the sum of $175,250.69 to Farr, Whitlock in return for payment of the draft. On August 26, 1960, as instructed, Societe Generale presented the documents to Farr, Whitlock for payment, but the broker refused to accept them, giving as its reason the fact that one of the three necessary copies of the shipping documents was missing.
 
 
 15
 Meanwhile, on August 16, a shareholder of C.A.V. brought an action in the New York Supreme Court, Kings County, pursuant to N.Y.Civ.Prac.Act, 977-b for the appointment of a receiver for the assets of C.A.V. in New York.[1] That same day the New York court ex parte appointed the present defendant Sabbatino as Temporary Receiver. A certified copy of the order appointing the Temporary Receiver was served on Farr, Whitlock on August 23.
 
 
 16
 On Friday, August 26, the same day on which Societe Generale first tried to make delivery of the shipping documents and receive payment for the plaintiff, officers of C.A.V. advised Farr, Whitlock orally and in writing that C.A.V., not the Cuban government or its agencies, was the true owner of the sugar covered by the bills of lading in the hands of Societe Generale.[2] C.A.V. enclosed in its letter to Farr, Whitlock a notice of the appointment of the Temporary Receiver. Later that day Farr, Whitlock and C.A.V. entered into an agreement by which Farr, Whitlock promised to retain any proceeds it might receive from the sugar shipment here involved until it was compelled by a court order to turn them over to the Receiver or anyone else. C.A.V. promised to indemnify Farr, Whitlock against any claims with respect to the sugar, except a claim by the Receiver; to defendant any suit against Farr, Whitlock involving the sugar or the proceeds therefrom, except a proceeding by the Receiver; and to pay Farr, Whitlock ten per cent of the sum of $175,000 if C.A.V. ever obtained that sum.
 
 
 17
 Monday morning, August 29, 1960, Societe Generale again presented the draft to Farr, Whitlock, this time with all the necessary documents. The plaintiff claims that Farr, Whitlock informed Societe Generale that it would take the documents for inspection and that a representative of the French bank might return later that day for payment. Farr, Whitlock claims on the other hand, that Societe Generale presented the documents in the usual manner and that no conversation took place. In either event, the same day Farr, Whitlock negotiated the bills of lading to its customer and received payment of the purchase price in the amount of $175,250.69.
 
 
 18
 A representative of Societe Generale returned to Farr, Whitlock's office at 3:00 P.M. that day to receive payment of the draft. He was informed, the plaintiff maintains, that the bills of lading had been negotiated and that Farr, Whitlock had received the proceeds but that it would not turn over the proceeds to Societe Generale because C.A.V. claimed them.
 
 
 19
 About two hours later Farr, Whitlock was served with an order of the Supreme Court of New York, Kings County, enjoining it from taking any action which might result in removing assets claimed by C.A.V. out of the State of New York. That same day Farr, Whitlock notified the French bank by letter that the sugar broker had notice of the appointment of the receiver for C.A.V.'s New York assets, that C.A.V. claimed the sugar proceeds here involved, that the broker had received formal notification of a motion in the New York court to vacate the receivership,[3] and that Farr, whitlock had been served with the order mentioned in the preceding sentence. Therefore, the letter stated, Farr, Whitlock was obliged to retain the proceeds until directed by a competent court to give them up. Societe Generale formally protested the non-payment of the draft.
 
 
 20
 On October 24, 1960, the Supreme Court of New York, Kings County, ordered Farr, Whitlock to transfer the proceeds less $1,314.38, commissions due the broker, or a total of $173,936.31, to Sabbatino, broker, or a total of $173,936.31 to Sabbatino, the court's determination as to the rightful owner of the proceeds. The commodity broker transferred the proceeds as the state court ordered.
 
 
 21
 The plaintiff filed its complaint in the present action in the United States District Court for the Southern District of New York on October 10, 1960, and amended it on October 31 in the light of the New York court's order of October 24, referred to in the preceding paragraph. In the amended complaint, the Cuban bank alleged that Farr, whitlock's refusal either to return the bills of lading or to pay over the proceeds of the sale to Societe Generale was a conversion of the bills and of the proceeds. The plaintiff asked the federal court to enter judgment for it against Farr, Whitlock in the amount of $175,250.69 and to enjoin Sabbatino from exercising jurisdiction over the sums paid to him.
 
 
 22
 The defendant Farr, Whitlock answered, and filed a cross-claim for judgment over against the defendant Sabbatino in the amount of $173,936.31, being the sum which the broker had paid to the Receiver, should the plaintiff recover judgment against Farr, Whitlock. The commodity broker also raised a counterclaim in the amount of $412,807.12 based on an unrelated shipment of Cuban sugar.
 
 
 23
 Sabbatino moved to dismiss the plaintiff's complaint as to him and the broker's cross-claim for failure to obtain permission to sue him from the court which appointed the Receiver. Farr, Whitlock moved to dismiss the Cuban bank's action against it because of alleged lack of jurisdiction over the subject matter. The plaintiff moved for summary judgment against both defendants. Farr, Whitlock moved for summary judgment against the Receiver in the event that the plaintiff obtained summary judgment against Farr, Whitlock. The district court below treated all these motions in a single, scholarly opinion, reported at D.C., 193 F.Supp. 375 (1961). It denied the broker's motion to dismiss, holding that it had jurisdiction over the subject matter and, on the plaintiff's motion for summary judgment, granted judgment for the defendants, thereby rendering the other motions moot. The plaintiff then appealed to this court.
 
 
 24
 Inasmuch as they are presently involved in several cases with issues similar to those in this case, we allowed the Cuban-American Sugar Company and its wholly-owned subsidiary, the Cuban American Sugar Mills Company, to file a brief as amici curiae.
 
 
 25
 This appeal raises very important and difficult legal questions in the fields of international relations, state-federal relations, and judicial-executive relations.
 
 
 26
 In its complaint the plaintiff invoked federal jurisdiction on the basis of diversity of citizenship between itself and the defendants, 28 U.S.C. 1332, and on the basis of the presence of a federal question 28 U.S.C. 1331. As the plaintiff is a Cuban corporation and the defendants are citizens of New York, New Jersey, and Florida, the diversity jurisdiction of the federal court was established. We need not decide whether jurisdiction could have also been grounded on the federal question jurisdiction of the district court.
 
 
 27
 But Farr, Whitlock contends that the jurisdiction of the federal court was defective in another respect. Because a court without jurisdiction has no power to adjudicate upon the merits of a controversy, the first question to be resolved in an orderly consideration of the numberous questions raised in this litigation is whether the court below was correct in denying Farr, Whitlock's motion to dismiss the complaint against it on the ground that the federal court lacked jurisdiction over the subject matter. Farr, Whitlock's motion was based on the proposition that, as the proceeds of the sale had been turned over to a New York state court and as that court had perfected its jurisdiction either in rem or quasi in rem over those proceeds before the U.S. District Court had perfected its jurisdiction over the parties, the U.S. District Court lacked jurisdiction over the subject matter. See Penn Gen. Cas. Co. v. Pennsylvania, 294 U.S. 189, 196, 55 S.Ct. 386, 79 L.Ed. 850 (1935); Harkin v. Brundage, 276 U.S. 36, 43-45, 48 S.Ct. 268, 72 L.Ed. 457 (1928). It has long been established that the court which first obtains jurisdiction over a particular res is entitled to retain that jurisdiction to the exclusion of other courts. See Hagan v. Lucas, 35 U.S. (10 Pet.) 400 (1836); Taylor v. Carryl, 61 U.S. (20 How.) 583, 597 (1858); Freeman v. Howe, 65 U.S. (24 How.) 450 (1861); Hart & Wechsler, the Federal Courts and The Federal System 1073 (1953).
 
 
 28
 But if the action brought in the federal court is an in personam action that does not interfere with the state court's jurisdiction over the fund it holds, the federal court has jurisdiction to adjudicate the rights of the parties. United States v. Bank of New York & Trust Co., 296 U.S. 463, 477, 56 S.Ct. 343, 80 L.Ed. 331 (1936); Stanton v. Embrery, 3 Otto 548, 93 U.S. 548, 23 L.Ed. 983 (1877). This is so even if the issues in the state court case and in the federal court case are identical. The rule is well stated in the leading case of Kline v. Burke Construction Co., 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226 (1922), where both relevant actions were in personam actions:
 
 
 29
 'But a controversy is not a thing, and a controversy over a mere question of personal liability does not involve the possession or control of a thing, and an action brought to enforce such a liability does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending. Each court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in other, the effect of that judgment is to be determined by the application of the principles of res adjudicata by the court in which the action is still pending in the orderly exercise of its jurisdiction, as it would determine any other question of fact or law arising in the progress of the case. The rule, therefore, has become generally established that where the action first brought is in personam and seeks only a personal judgment, another action for the same cause in another jurisdiction is not precluded.'
 
 
 30
 For cases applying this rule where an in rem or quasi in rem action preceded an in personam one see Markham v. Allen, 326 U.S. 490, 66 S.Ct. 296, 99 L.Ed. 256 (1945) (state action followed by federal one); United States v. Klein, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840 (1938) (federal action followed by state one); Commonwealth Trust Co. v. Bradford, 297 U.S. 613, 56 S.Ct. 600, 80 L.Ed. 920 (1936) (state action followed by federal one).
 
 
 31
 The plaintiff in the present case in an in personam action seeks a money judgment for damages against Farr, Whitlock for conversion. The fund in the hands of the New York State court need not be interfered with by a judgment for the plaintiff against Farr, Whitlock personally. Therefore, the state court's control of the sale proceeds has not preempted the jurisdiction of the federal court over the subject matter of the present litigation, and the court below was correct in holding that it had jurisdiction to decide the controversy between the parties.
 
 
 32
 Farr, Whitlock further contends, however, that even if the federal district court for the Southern District of New York did have jurisdiction to decide this case, it should have, in its sound discretion, in view of the pending state court litigation, abstained from entering a judgment. But the Supreme Court has announced:
 
 
 33
 'The doctrine of Abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary any narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.' (County of Allegheny v. Frank Mashuda Company, 360 U.S. 185, 188-189, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959).)
 
 
 34
 Abstention has been approved when it permits the federal court to avoid reaching a decision of constitutional magnitude, or when state court determination of relevant issues of state law would present the federal constitutional issue in a different posture. City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959); Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957); Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). It has also been approved when decision by the federal court would unduly strain the relationship between the state and federal jurisdictions. See, e.g., Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Alabama Pub. Serv. Comm'n v. Southern Ry., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). But the mere adjudication by a federal court of a particular issue identical with an issue involved in pending litigation in a state court has never been considered so irritable to state prerogatives as to constitute a ground for federal abstention, even though the proceeding in the state court became truncated through an application of the rules of res judicata or collateral estoppel. Moreover, as this controversy involves our national foreign affairs, it is certainly appropriate for its determination to be made on the merits by a court of the United States. The court below properly exercised its discretion in declining to abstain from its duty of adjudication.[4]
 
 
 35
 Since the federal court had jurisdiction to decide the merits of the controversy between the Cuban national bank and Farr, Whitlock, we now come to a consideration of those merits. The substantive issues raised by the plaintiff's claims against the state-court-appointed receiver are identical with those raised against Farr, whitlock. as we have jurisdiction to adjudicate those substantive issues, we find it unnecessary and unwise at this time, in light of the decision we reach on the merits, to go into the question of the power of a federal court to enjoin a state appointed receiver.
 
 
 36
 As federal court jurisdiction over the present case rests upon the diversity of citizenship of the parties, we look, initially at least, to the law of the State of New to defermine the litigants' rights. To recover judgment on a theory of conversion, the plaintiff must establish title, possession or right to possession, or some property interest in the subject matter which plaintiff claims the defendants converted to their own use and which provides the basis for the lawsuit. Kaufman v. Simons Motor Sales Co.,261 N.Y. 146, 184 N.E. 739 (1933); Johnson v. Blaney, 198 N.Y. 312, 91 N.E. 721 (1910). Since the plaintiff's alleged rights in the bills of lading and in the proceeds received from the sugar depend upon plaintiff's prior ownership of the sugar the determination of whether Farr, whitlock is a converter depends upon whether C.A.V. or the Government of Cuba owned the sugar when it left Cuba. Under the ordinary rules of conflict of laws, title to this sugar would be determined by the law of Cuba, namely, the decreeof expropriation of August 6, 1960.[5] See Restatement, Conflict of Laws 260 (1934); cf. M. Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 186 N.E. 679, 89 A.L.R. 345 (1933). The appellees, however, attack this decree as invalid under (1) the municipal law of Cuba, (2) the public policy of the forum, and (3) the rules and principles of international law.
 
 The appellant, on the other
 
 37
 The appellant, on the other hand, asserts that irrespective of the appellees' the expropriation decree we must decide in appellant's favor because under the Act of State Doctrine this court may not inquire into the validity of the Cuban decree. The Act of State Doctrine, briefly stated, holds that American courts will not pass on the validity of the acts of foreign governments performed in their capacities as sovereigns within their own territories. The actions of foreign nations accorded this respect may be executive, legislative, or judicial in nature, althrough court judgments, because they ordinarily involve the resolution of private disputes and do not ordinarily reflect high state policy, do not usually come within this category. Restatement, Foreign Relations Law of the United States 41,. comment c (Proposed Official Draft, 1962). This doctrine is one of the conflict of laws rules applied by American courts; it is not itself a rule of international law. Id., comments b, g; Zander, The Act of State Doctrine, 53 Am.J.Int'l L. 826, 837, 844 (1959). But see Falk, Toward a Theory of the Participation of Domestic Courts in the International Legal Order: a Critique of Banco Nacional de Cuba v. Sabbatino, 16 Rutgers L.Rev. 1, 34-35 (1961).[6] The act of state doctrine stems from the concept of the immunity of the sovereign because 'the sovereign can do no wrong.' See Note, The Castro Government in American Courts: Sovereign Immunity and the Act of State Doctrine, 75 Harv.L.Rev. 1607, 1608 (1962).
 
 
 38
 The act of state doctrine has had a place in American jurisprudence for a very long time. It may date from the Supreme Court's decision in Hudson v. Guestier, 8 U.S. (4 Cranch) 293 (1808), in which the Court held that it could not review the correctness of a seizure by a foreign power within the territorial jurisdiction of that sovereign 'unless the court passing the sentence loses its jurisdiction by some circumstance which the law of nations can notice.'
 
 
 39
 The first case in the Supreme Court clearly to recognize the doctrine was Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). In that case the plaintiff sued the commander of a revolutionary army in Venezuela for damages suffered from an alleged false imprisonment and assault perpetrated by the defendant's soldiers during Venezuelan hostilities. The United States subsequently recognized the revolutionary government under which the defendant acted. The Supreme Court refused to consider the plaintiff's contentions on the merits. The Court states:
 
 
 40
 'Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of any sovereign powers as between themselves' (168 U.S. at 252, 18 S.Ct. at 84).
 
 
 41
 Another case in the history of the act of state doctrine was the well-known opinion of Mr. Justice Holmes in American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). The plaintiff alleged that the defendant conspired with the Government of Costa Rica to deprive the plaintiff of its plantation and railroad in that country. As in Underhill, the Court refused to entertain the plaintiff's substantive contentions. Mr. Justice Holmes, for the Court, explained that a sovereign within its territorial jurisdiction could not itself commit an unlawful act because the sovereign's act within its own boundaries was the law there.[7]
 
 
 42
 The Supreme Court further developed the doctrine in two decisions rendered in 1918. In Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918) the plaintiff, a citizen of Mexico, sought to replevy certain hides which Pancho Villa as General Carranza's 'Commander of the North' had seized from the plaintiff during the Mexican Civil War of 1913 and later had sold to the defendant. The Court refused to grant relief to the plaintiff for several reasons: the foreign relations of the United States were committed to the legislative and executive branches of the Government, recognition of Carranza's government de jure validated all its acts from the beginning of its existence, the sovereignty of a foreign government must be respected within its jurisdiction, and reexamination of the acts of one nation's government within its own territorial limits by the courts of another nation would interfere with friendly relations between governments. The Court relegated the plaintiff to whatever remedies he might have in the courts of Mexico or to whatever results he might obtain by diplomatic negotiation. Toward the end of its opinion the Court stated:
 
 
 43
 'It is not necessary to consider, as the New Jersey court did, the validity of the levy of the contribution made by the Mexican commanding general, under rules of international law applicable to the situation, since the subject is not open to reexamination by this or any other American court' (246 U.S. at 304, 38 S.Ct. 309, 311).
 
 
 44
 The other case of that year was Ricaud v. American Metal Co., 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918). Another one of Carranza's generals had seized a large consignment of lead bullion from a Mexican mining company and had sold it to the defendants. Claiming that he had purchased the bullion from the mining company prior to the seizuer, the plaintiff, an American citizen, sought to recover it from the defendant. me, 163 F.2d 246 (2 Cir.), cert. denied, as it had stated in Oetjen v. Central Leather Co., supra, the Supreme Court denied the relief which the plaintiff sought.[8]
 
 
 45
 The act of state doctrine has been recognized and applied by this and other courts. See e.g., Republic of Cuba v. Pons, 294 F.2d 925 (D.C.Cir.1961), cert. denied, 368 U.S. 960 (1962); Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246 (2 Cir.), Bernstein 332 U.S. 772, 68 S.Ct. 88, 92 LEd. 357 (1947); United States ex rel. Von Heyman v. Watkins, 159 F.id 650 (2 Cir. 1947); Banco de Espana v. Federal Reserve Bank, 114 F.2d 438 (2 Cir.1940); The Claveresk, 246 F. 276 (2 Cir.1920); Hewitt v. Speyer, 250 F. 367 (2 Cir. 1919); Eastern States Petroleum Co. v. Asiatic Petroleum Corporation, 28 F.Supp. 279 (S.D.N.Y.1939); M. Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 186 N.E. 679, 89 A.L.R. 345 (1933); Holzer v. Deutsche Reichbahn-Gesell-schaft, 277 N.Y. 474, 14 N.E.2d 798 (1938); Dougherty v. Equitable Life Assur. Co., 266 N.Y. 71, 193 N.E. 897 (1934).
 
 
 46
 The policies and theories underlying this doctrine of judicial abnegation seem to be these: The desire by the judiciary to avoid possible conflict with or embarrassment to the executive and legislative branches of our Government in our dealings with foreign nations, see e.g., Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 N.Y. 372, 138 N.E. 24 (1923); a positivistic concept of territorial sovereignty, see e.g., American Banana Co. v. United Fruit Co., supra; and a fear of hampering international trade by rendering titles insecure, see e.g., Banco de Espana v. Federal Resserve Bank,supra. It has also been suggested that the remoteness of American courts from the circumstances surrounding the making of the foreign decree and the provincial attitude taken by most municipal courts make American courts unsuitable tribunals for judging the validity of acts committed by foreign sovereigns within their territorial limits. See Reeves, Act of State Doctrine and the Rule of Law-- A Reply, 54 Am.J.Int'l L. 141, 144-48 (1960); Falk,supra at 10. See, generally, Zander, The Act of State Doctrine, 53 Am.J.Int'l L. 826, 834 (1939); Falk, supra at 31-32.
 
 
 47
 However, when the executive branch of our Government announces that it does not oppose inquiry by American courts into the ligality of foreign acts, an exception to the judicial abnegation required by the act of state doctrine has arisen and has been recognized both in this circuit and elsewhere. In Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 210 F.2d 375 (2 Cir.1954) (per curiam), when we received word from the State Department that it was State Department policy to permit American courts to pass on the validity of acts done by Naxz officials, our court rescinded its earlier mandate by which, based upon the act of state doctrine, we had prevented the district court from questioning the validity of the acts of the German Nazi government. See 173 F.2d 71 (2 Cir. 1949). See also Bernstein v. Van Heyghen Freres, S.A., 163 F.2d 246, 252 (2 Cir.), cert denied, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); Restatement, Foreign Relations Law of the United States 44 (Proposed Official Draft, 1962); Kane v. National Institute of Agrarian Reform, (Fla.Cir.Ct) 18 Fla.Supp. 116; Association of the Bar of the City of New York, Committee on International Law, Report, A Reconsideration of the Act of State Doctrine in United States Courts 13 (May 1959); Zander, The Act of State Doctrine, 53 Am.J.Int'l L. 826 (1959).
 
 
 48
 This exception is applicable to the case before us. While the case has been pending we have been enlightened, as the court was in the Bernstein case, supra, as to the attitude of the Department of State. In a letter, dated October 18, 1961, addressed to counsel for the amici in this case, the Legal Adviser to the State Department asserted:
 
 
 49
 'The Department of State has not, in the Bahia de Nipe case or elsewhere, done anything inconsistent with the position taken on the Cuban nationalization by Secretary Herter. Whether or not these nationalizations will in the future be given effect in the United States is, of course, for the courts to determine. Since the Sabbatino case and other similar cases are at present before the courts, any comments on this question by the Department of State would be out of place at this time. As you yourself point out, statememts by the executive branch are highly susceptible of misconstruction.'
 
 
 50
 In a subsequent letter, dated November 14, 1961, the Under secretary of State for Economic Affairs stated:
 
 
 51
 'I have carefully considered your letter and have discussed it with the Legal Adviser. Our conclusion, in which the Secretary concurs, is that the Department should not comment on matters pending before the courts.'
 
 
 52
 On April 13, 1961, the State Department told the litigants in Kane v. National Institute of Agrarian Reform, (Fla.Cir.Ct.) (1961) 18 Fla.Supp. 116, a case that involved another confiscation by the Castro Cuban government of Americanowned property in Cuba: 'Efect in U.S. of Decrees, etc. of Castro regime is question for court in which case heard.' These statements are somewhat ambiguous, perhaps intentionally so. But at the least they express a belief on the part of those responsible for the conduct of our foreign affairs that the courts here should decide the status here of Cuban decrees. Of course, if there is no good reason for abstention, a cort should recognize and accept its fundamental responsibility to decide a case before it in accordance with whatever substantive norms may be relevant; and when, as here, the State Department is willing for the court to adjudicate the rights of the parties, one of the basic reasons for the act of state doctrine-- the danger that independent judicial decisions might interfere with this country's foreign relations-- is inapplicable to support abstention. The broad statements in cases such as Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct 309, 62 L.Ed. 726 (1918) and Shapleigh v. Mier, 299 U.S. 468, 57 S.Ct. 261, (1937) could not have been intended by the Supreme Court to require a judicial avoidance of judicial responsibility in a case where the State Department has expressed a lack of concern as to the outcome of the litigation.
 
 
 53
 But even though we perceive no danger to American foreign policy from a determination by an american court of the merits of this litigation presently before us, perhaps there is some other ground that compels us to accept without question the validity of the Cuban decree here involved. With this in mind we turn to a consideration of the appellees' three-pronged attack upon the validity of that decree of expropriation. The appellees first claim that the decree is invalid under the law of Cuba because the Cuban government falled to comply with the formal requisite of its publication in the Official Gazette of Cuba. But in American Banana Co. v. United Fruit Co., supra, and other similar cases, was apparently held held the acts of a foreign soverage could not be invalid under its own law. Therefore, we will reject the appellees' contention, based upon Cuban law, that we should hold the decree ineffective because of a claimed invalidity under that law.
 
 
 54
 Also, we decline to adopt appellees' second contention, that this court should not enforce the Cuban decree because it is contrary to American public policy. Judge (later Justice) Cardozo in his famous opinion in Loucks v. Standard Oil co., 224 N.Y. 99, 120 N.E. 198 (1918), defined the type of local public policy which requires that the forum not enforce a foreign created right. He said:
 
 
 55
 'The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors, unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.' (224 N.Y. at 111, 120 N.E. at 202).
 
 
 56
 The right to just compensation in return for property taken by the government is certainly well established in American jurisprudence. It is even protected by the Constitution, Amend. V. Therefore, it is likely that any taking of one's property without provision for adequate compensation is contrary to the public policy of this forum, as Cardozo, J. defined that concept. See Vladikavkazsky Ry. v. New York Trust Co., 263 N.Y. 369, 189 N.E. 456, 91 A.L.R. 1426 (1934). But we are aware of the admonition that public policy is an 'unruly horse.' The concept has proved to be a very difficult one to confine when one seeks to apply it. We are not entirely certain what the American public would consider to be the proper policy of the United States with respect to expropriation of the property of aliens by foreign sovereigns when the property has its situs within th foreign countries. Also, decision of this case based upon the public policy of this forum is undesirable because reliance upon such a basis for decision results in a nationalistic, or municipal, solution of a problem that is clearly international. See Zander, supra at 848. Finally, inasmuch as the decision in the present case is reachable by taking advantage of an exception to the long-established act of state doctrine, we find it wiser, when given the opportunity of relying upon alternative grounds for decision, to base our result on the ground which appears to us to be the narrower exception to that doctrine.
 
 
 57
 Thus we turn to a consideration of the appellees' third contention, that the appellant's title is invalid under international law. Although the law of nations is a hazy concept, its rules are more limited in scope than are the public policy concepts of a particular nation within the family of nations. Moreover, if we apply international law to the present case, we find that the reasons put forward in support of the act of state doctrine are either inapplicable or insufficient to preclude us from inquiring into the validity of the Cuban decree on the limited basis of an inquiry as to the decree's consistency with international rules of law. First, as pointed out earlier in the opinion, the State Department has no desire to interfere here with independent decision by the judiciary. Second, the very propositio that something known as international law exists carries with it the implication that national sovereignty is not absolute but is limited, where the international law impinges, by the dictates of this international law. Eagleton, Responsibility of States in International Law 65 (1928). See Sohn & Baxter, Convention on State Responsibility art. 2 (Draft No. 12, 1961). Third, when an agency of the expropriating country instead of some third party is the litigant relying upon the expropriation for its title, the problem of preserving the security of the titles to property that is the subject of international trade is not presented. See Falk, supra at 15. Fourth, this court is not so unfamiliar with the legal, political, and social circumstances surrounding the Castro government's seizure of C.A.V. as to be incompetent to pass on its validity under international law. Finally, although it can be argued that nationalistic prejudice could affect decision in cases of this sort, it is also often claimed that other biases in various obnoxious forms are present in the minds of judges in other types of cases. judges are properly admonished when reminded that judicial duty requires that controversies be decided fairly and without passion, but we also have a duty not to excuse ourselves from exercising the duty of decision when parties and subject matter are properly before us. Thus neither reason nor precedent precludes this court from considering the appellees' contentions, based upon international law concpts, that the court below should be affirmed.
 
 
 58
 Farr, whitlock contends that the decree of August 6, 1960, nationalizing the Cuban property owned by American corporations was a violation of international law on three gounds: Adequate compensation was not provided; the purpose of the seizure was retaliation against the United States; and the expropriation was discriminatory in operation.
 
 The Supreme Court has said:
 
 59
 'International law is part of our law, and must be ascertained and administered by the Courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.' (The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900).)
 
 
 60
 See The Nereide, 9 Cranch 388, 13 U.S. 388, 3 L.Ed. 769 (1915); United States v. Smith, 5 Wheat 153, 18 U.S. 153, 5 L.Ed. 57 (1820); The Scotia, 14 Wall., 170, 20 L.Ed. 822, 81 U.S. 170 (1871); 1 Oppenheim, International Law 41-42 (8th ed. 1955). In the absence of any relevant treaty, enactment of the legislature, act of the executive, or controlling judicial decision, we have been told to draw the guiding concepts of international law from the customs and usages of civilized nations. The Paquete Habana, supra. It would seem that this statement requires at least one qualification. International law is derived indeed from the customs and usages of civilized nations, but its concepts are subject to generally accepted principles of morality whether most men live by these principles or not. See Statute of the International Court of Justice art. 38, 1946-47 U.N. Yearbook 843. But see The Antelope, 10 Wheat 66, 23 U.S. 66, 6 L.Ed. 268 (1825). Judges of municipal courts, the bulk of whose decisions involve questions under a domestic law derived from a long-established and increasingly elaborate national legal system, will often find themselves unfamiliar with the ratiocination necessary for decision in this area, where recognized precedent and accepted authority are acant. Anyone who undertakes a search for the principles of international law cannot help but be aware of the nebulous nature of the substance we call international law. See Rado, Czechoslovak Nationalization Decrees: Some International Aspects, 41 Am.J.Int'l L. 795, 797 (1947). The lack of effective international remedies doubtless contributes to this state of affairs. See Falk, Toward a Theory of the Participation of Domestic Courts in the International Legal Order: a Critique of Banco Nacional de Cuba v. Sabbatino, 16 Rutgers L.Rev. 1, 2 & n. 3(1961). But until the day of capable international adjudication among countries, the municipal courts must be the custodians of the concepts of international law, and they must expound, apply and develop that law whenever they are called upon to do so. See Lauterpacht, Re Helbert Wagg: A. Further Comment, 5 Int'l & Comp.L.Q. 301 (4th Ser.1956); Falk, supra at 2.
 
 
 61
 One pitfall into which we could stumble would be the identification as a fundamental principle of international law of some principle which in truth is only an aspect of the public policy of our own nation and not a principle so cherished by other civilized peoples. In avoiding such an identification we must take a more cosmopolitan view of things and recognize that the rule of law which we municipally announce must be a rule applicable to sovereignties with social and economic patterns very different from our own. See Sorensen, The International Court of Justice: Its Role in Contemporary International Relations, 14 Int'l Org. 261, 273 (1960). Castaneda, The Underdeveloped Nations and the Development of International Law, 15 Int'l Org. 38-44 (1961); Isaacson, International Law and Public Policy, 1961 (unpublished paper in Yale Law School Library). With these principles in mind, we proceed to a consideration of whether the decree under which the appellant claims it received good title to the sugar was in violation of international law.
 
 
 62
 The appellant argues that the Cuban decree against C. A. V. did not violate international law because C. A. V. was organized under the laws of Cuba. It is generally accepted, as appellant says, that acts of a state directed against its own nationals do not give rise to questions of international law. Zander, The Act of State Doctrine, 53 Am.J. Int'l Law 826, 836 (1959); 1 Oppenheim, International Law, 268 n. 2 (8th ed. 1955); Friedman, Expropriation in International Law 163 (1953); see M. Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 186 N.E. 679 (1933). But over ninety per cent of C. A. V.'s shareholders were United States nationals; and the Cuban decree which expropriated C. A. V.'s property clearly indicated that the property was seized because C. A. V. was owned and controlled by Americans. When a foreign state treats a corporation in a particular way because of the nationality of its shareholders, it would be inconsistent for us in passing on teh validity of that treatment to look only to the 'nationality' of the corporate fiction. The more frequent practice in international litigation and negotiation seems to be that the nationality of the corporation is disregarded when it is different from the nationality of most of the corporation's shareholders. See El Triunfo, 2 Moore, International Law 649-51, (1902) Foreign Rel. U.S. 859-73; Tlahualilo, 5 Hackworth, International Law 842, (1913) Foreign Rel. U.S. 993; Alsop (1910) Foreign Rel. U.S. 138-89, (1911) id. 38; Charbonnage Frederic Henri S. A. v. Germany, (1919-22) Ann.Dig. 227; Baron de Neuflize v. Germany, (1927-28) Ann.Dig. 323-24; Romano-Americana, 5 Hackworth, International Law, 702-05, (1926) 2 Foreign Rel. U.S. 313, (1928) 2 Foreign Rel U.S. 957, (1929) 3 Foreign Rel. U.S. 757; Friedman, op. cit. supra at 171; Delagoa Bay, 2 Moore, International Arbitration 1865, 1874, (1902) Foreign Rel. U.S. 848, 849. Thus we shall place no significance for present purposes on the fact that C. A. V. was chartered in Cuba.
 
 
 63
 The first aspect of the nationalization of C. A. V.'s property which the appellees ask us to consider is the fact that the decree authorizing the seizure did not provide for the payment of adequate compensation.[9] The patent inadequacy of the remuneration for the property seized is set forth in the provisions of Law 851, under which the decree of expropriation was issued. See State Dept. Note No. 397, July 16, 1960 (to Cuban Ministry of Foreign Relations). An illusory compensation took the form of an issue of Cuban Government Bonds having terms of not less than thirty years and bearing interest at less than two per cent per annum. This interest was to be paid exclusively out of a fund to be set up by the appellant bank which fund would consist of twenty-five per cent of the foreign exchange received by Cuba from its annual sales to the United States of Cuban sugar in excess of three million Spanish long tons at a price of not less than 5.75 cents per English pound (f.a.s). The bonds were also to be amortized out of this fund under authority vested in the President of Cuba to decide to what extent the bonds would be amortized over a period of not less than thirty years. The Cuban President and Prime Minister were to select the appraisers who would value the expropriated property for compensation purposes. It is unclear whether the bonds would be paid at maturity if the fund were insufficient to cover payment. The possibility that there would be any fund at all was little more than a travesty. For the ten years immediately preceding the nationalization of C. A. V.'s property the average price this country paid to Cuba for raw sugar never exceeded 5.50 cents per English pound (f.a.s.), see H.R.Rep. 1746, 86th Cong., 2d Sess. 16 (1960); but to finance the fund the Cuban Government demanded 5.75 cents per pound, only one quarter of which would go into the fund. Moreover, in only one of the immediately preceding ten years had Cuba sold this country more than three million Spanish long tons of 2,272 English pounds each and in only three years out of the whole period from 1934 through 1959 had she sold us that much sugar, see H.R.Rep. 1746, supra at 5; but contributions would be made into the fund only out of yearly sales to the United States in excess of three million Spanish tons. In short, there would be no interest and no amortization, full compensation at maturity of the bonds would be highly unlikely, and there would be no market value for the bonds.
 
 
 64
 But is the failure to provide adequate compensation for the compulsory taking of the property of a domestically chartered corporation owned by alien stockholders a violation of international law? The constitutions of most of the states in the Western Hemisphere contain language which appears to uphold the right of the owner to receive just compensation upon a governmental taking of private property. Lord McNair stated as one postulate of international law:
 
 
 65
 'The nationalization must be accompanied either by contemporaneous payment of adequate compensation or effective measures which ensure and make certain its prompt payment.' McNair, The Seizure of Property and Enterprises in Indonesia, 6 Netherlands Int'l L.Rev. 218, 243 (1959).
 
 
 66
 The United States Department of State has asserted this proposition to foreign countries on numerous occasions.[10] The Restatement, Foreign Relations Law of the United States 190(b) (Proposed Official Draft 1962) is to the same effect:
 
 
 67
 '190. Thwn Taking is Wrongful Under International Law'The taking by a state of property of an alien is wrongful under international law if * * *
 
 
 68
 '(b) it is not accompanied by payment of just compensation or, under the law and practice of the state in effect at the time of taking, there is not reasonable provision for the determination and payment of just compensation * * *'
 
 
 69
 A number of decisions by international tribunals have upheld the principle that just compensation should be provided.[11] And it appears that most of the writers on the subject have asserted that just compensation for governmental taking is a requirement of international law.[12]
 
 
 70
 But some writers have asserted that the payment of adequate compensation is not required by international law. Friedman, Exproriation in International Law 206 (1953); Baade, Indonesian Nationalization Measures before Foreign Courts-- A Reply, 54 Am.J.Int'l L. 801, 803-04 (1960); Williams, International Law and the Property of Aliens, Brit.Yb.Int'l L. 1 (1928); see Brierly, Law of Nations 178 (2d ed. 1936); Isaacson, International Law and Public Policy 1961 (unpublished paper in Yale Law School Library). Cf. Baade, supra at 834. Tremendous social and cultural changes are occurring in many parts of the world today. Many countries have acted upon the principle that, in order to carry out desired economic and social reforms of vast magnitude, they must have the right to seize private property without providing compensation for the taking. They argue that because of the paucity of funds in their governmental coffers it would be impossible to carry out large-scale measures in the name of social welfare if they had to provide immediate, or even delayed, compensation. The Reporter of the Restatement, Foreign Relations Law of the United States frankly admits that some states including ones in Latin America other than Cuba, do not recognize any requirement to pay compensation.[13] It is commonplace in many parts of the world for a country not to pay for what it takes. See Falk, supra at 32. Since it is unnecessary for this court in the present case to decide whether a government's failure, in and of itself, to pay adequate compensation for the property it takes is a breach of international responsibility, we decline at this time to attempt a resolution of that difficult question.
 
 
 71
 Instead, we narrow the question for decision to the following: Is it a violation of international law for a country to fail to pay adequate compensation for the property it seizes from a particular class of aliens, when the purpose for the seizure of the property is to retaliate against the homeland of those aliens and when the result of such seizure is to discriminate against them only. To answer this more limited question we must now consider the retaliatory purpose and the discriminatory operation of the nationalization decree are closely related should appear obvious that these two features of the decree are closely related to one another.
 
 
 72
 The history of the relations between the United States and the Castro government in the period immediately preceding the decree of expropriation, as well as the words of the decree itself, demonstrate that one of the fundamental purposes of the confiscation was retaliation against this country. On July 6, 1960, Congress amended the Sugar Act of 1948, 61 Stat. 922 (1947), as amended, 7 U.S.C.A. 1100-61, so as to permit the President to reduce the sugar quota allotted to Cuba for the period extending through March 31, 1961. 74 Stat. 330 (1960); as amended 7 U.S.C.A. 1158. Under the law as it stood before this amendment, Cuba would have had the option to supply sugar to this country in excess of the basic quota allotted to her, since sugar growers in this country were finding it impossible to fill the quota allotted to them. 70 Stat. 219 (1956), 7 U.S.C.A. 1114(a). See 106 Cong. Record 14680 (1960) (remarks of Senator Long). The Secretary of State testified before the House Committee on Agriculture that the purpose of the amendment was to secure an adequate supply of sugar. He said that Cuba, which had in the past provided about one-third of the sugar consumed in the United States, might not remain a reliable source of sugar because of the increasing diversification of her economy, and because of her commitments to supply sugar to certain Communist countries. He added that 'other circumstances' also made it appropriate for Congress to pass the legislation. Hearings Before House Committee on Agriculture on H.R. 12311, H.R. 12534, and H.R. 12624, 86th Cong., 2d Sess. 3-5 (1960). Other legislative history made it abundantly clear that the main purpose of the amendment was to impose a sanction against an unfriendly nation. E.g., 106 Cong.Recrod 15228-48, 15744-29 (1960). On the day following the passage of this legislation, July 7, 1960, the President greatly reduced the sugar quota allotted to Cuba. Proclamation No. 3355, 25 Red.Reg. 6414 (1960), 7 U.S.C.A. 1158 note.
 
 
 73
 In Havana on the same day that the congress of the United States passed the amendment to the Sugar Act of 1948 by which a reduction in Cuba's sugar quota was authorized, the Cuban Council of Ministers promulgated Law No. 851, which gave the President and Prime Minister of Cuba joint authority to expropriate American property in Cuba. That this law was promulgated as an answer to the amendment to the American Sugar Act is clear from its preamble.[14] Then, on August 6, 1960, pursuant to Law No. 851, Executive Power Resolution No. 1 was issued, expropriating the Cuban assets of C. A. V., along with the assets of twenty-five other corporations owned by United States nationals. The preamble of the executive resolution included language almost identical with that in Law No. 851. See supra at 849. Thus we have no doubt that one of the basic reasons for the seizure here involved was to retaliate against the reduction by the United States in the sugar quota it had allotted to Cuba.
 
 
 74
 Several authorities have announced that confiscation of the property of the nationals of a particular country without the payment of compensation when done as an act of retaliation is contrary to international law. The American Branch of the International Law Association's Committee on Nationalization of Property has stated: 'Under International law, a State may not take foreign interests as a measure of political reprisal.' American Branch of the International Law Association, Proceedings and Committee Reports 68 (1957-58). Restatement, Foreign Relations Law of the United States 205 & Ill. 1 (Proposed Official Draft 1962) supports this proposition. Lord McNair declared in regard to Indonesian seizures of Dutch property during the dispute between the Netherlands and Indonesia over control of Dutch New Guinea:
 
 
 75
 'In my opinion the absence of a bona fide, social or economic purpose involving the property nationalized is vital and alone suffices to render unlawful the (Indonesian) Nationalization Act of 1958 * * *' McNair, The Seizure of Property and Enterprises in Indonesia, 6 Netherlands Int'l L.Rev. 218, 243 (1959).
 
 
 76
 And in Anglo-Iranian Oil Co. v. S.U.P.O.R. Co., Italian Civil Court of Rome, 1954, (1955) Int'l L.Rep. 23, 42, the court stated:
 
 
 77
 'Italian courts must refuse ot apply in Italy any foreign law which decrees an expropoiation, not for reasons of public interest, but for purely political persecutory, discriminatory, racial and confiscatory motives.'
 
 
 78
 See Seidl-Hohenveldern, Title to Confiscated Foreign Property and Public International Law, 56 Am.J.Int'l Law 507, 509-10 (1962); Falk, supra, at 9; see also Netherlands note to Indonesia, December 18, 1959, 54 Am.J.Int'l L. 484, 485-86 (1960); Senembah Maatschappij N.V. v. Republiek Indonesie Bank Indonesia and De Twentsche Bank N.V., Court of Appeals of Amsterdam, (1959) Nederlandse Jurisprudentie 218 (No. 73), aff'd, (1959) Nederlandse Jurisprudentie 855 (No. 350). Unlike the situation presented by a failure to pay adequate compensation for expropriated property when the expropriation is part of a scheme of general social improvement, confiscation without compensation when the expropriation is an act of reprisal does not have significant support among disinterested international law commentators from any country. And despite our best efforts to deal fairly with political and social doctrines vastly different from out own, we also cannot find any reasonable justification for such procedure. Peacetime seizure of the property of nationals of a particular country, as an act of reprisal against that country, appears to this court to be contrary to generally accepted principles of morality throughout the world.
 
 
 79
 The appellant seeks to justify retaliatory confiscation by the Cuban government by asserting that the United States was the first offender against international law by an attempt to coerce Cuba through the reduction of American purchases of Cuban sugar. If the United States had seized Cuban assets in this country without compensating the owners, we might find some merit in this contention, for then Cuba would be treating American nationals exacely as the United States was treating Cuban nationals. Cf. Restatement, Foreign Relations Law of the United States, 205 (Proposed Official Draft, 1962). But, whether she was wise or unwise, fair or unfair, in what she did, the United States did not breach a rule of international law in deciding, for whatever reason she deemed sufficient, the sources from which she would buy her sugar. We cannot find any established principle of international jurisprudence that requires a nation to continue buying commodities from an unfriendly source. Accordingly it follows that the amendment to the Sugar Act of 1948 did not excuse Cuba's prima facie breach of international law.
 
 
 80
 We come now to the issue of whether this retaliation involved a discrimination against United States nationals of such a nature as to render the expropriation invalid under international law. By referring only to United States nationals, Law No. 851 and the decree of expropriation issued thereunder would appear to be discriminatory, since retaliation against a person's homeland is not a reasonable basis for a distinction in treatment. But the appellant points out that under the Agrarian Reform Law and the Urban Reform Law, the Castro government confiscated the property of persons who were not United States nationals; and that the sugar enterprises owned by Cubans were expropriated on October 13, 1960, under yet another law, Law No. 890. Under the Agrarian Reform Law and the Urban Reform Law all large land holdings and multi-family dwellings were nationalized. These latter two pieces of legislation are of little relevance to the present case because of the substantial differences, in both policy and effect, between the nationalization of real estate as such and the nationalization of the means of production as such. But the seizure of Cuban-owned sugar enterprises on October 13, 1960, does bear directly upon whether the Cuban government discriminated against American-owned corporations, for it is obvious, of course, that the confiscation of Cuban-owned enterprises was not part of an effort by the Cuban government to retaliate against the United States. If the ultimate effect of all the expropriations by the Castro Cuban government was to treat Cuban-owned enterprises and American-owned enterprises exactly alike, it would be difficult for this court to find discrimination against American nationals. And, perhaps, international law is not violated when equal treatment is accorded aliens and natives, regardless of the quality of the treatment or the motives behind that treatment. See Williams, International Law and the Property of Aliens, 9 Brit. Yb. Int'l L. 1, 15 (1928). But see Restatement, Foreign Relations Law of the United States 169 & Comment a (Proposed Official Draft, 1962). Foachiri, Expropriation and International Law, 6 Brit. Yb. Int'l L. 159, 160 (1925); Kaeckenbeeck, The Protection of Vested Rights in International Law, 17 Brit. Yb. Int'l L. 1, 16 (1936); 2 Hyde International Law 876 (1945).
 
 
 81
 But there was a difference between the treatment of American-owned sugar enterprises and Cuban-owned sugar enterprises. American-owned sugar enterprises were expropriated on August 6, 1960; Cuban-owned sugar enterprises were not seized until October 13, 1960. A short lapse of time between similar provisions in the same program, standing alone, would not create discrimination. But the difference in time here is quite significant, because the shipment of sugar involved in this case left Cuba and was sold abroad between August 6 and October 13. And this difference of ten weeks' time stems directly from the efforts of the Cuban government to retaliate against the United States and its sugar-buying policy. Since we have held above that seizure of the assets of nationals of an unfriendly sovereign as part of a scheme of reprisal against that country is illegal under international law, it follows that a difference in the treatment accorded those nationals based upon reprisal is discriminatory. Therefore, at least with respect to the shipment of sugar here in question, the Cuban government discriminated against United States nationals.
 
 
 82
 When a state treats aliens of a particular country discriminatorily to their detriment, that state violates international law. Restatement, Foreign Relations Law of the United States, 170 & Ill. 2 (Proposed Official Draft, 1962); British Claims in the Spanish Zone of Morocco (1925) 2 U.N.Rep.Int'l Arb.Awards 615, 647 (Britain/Spain); Standard Oil Tankers Case, 22 Am.J. Int'l L. 404, 419-20 (1928); United States note to Romania, 19 Dep't State Bull. 408 (1948); Netherlands note to Indonesia, December 18, 1959, 54 Am.J. Int'l L. 484, 485-87 (1960); Rolin, 6 Netherlands Int'l L.Rev. 260, 269 (1959); Foighel, Nationalization: A Study in the Protection of Alien Property in International Law, 47 (1957); Van Hecke, Confiscation, Expropriation and the Conflict of Laws, 4 Int'l L.Q. 345 (1951); Sohn, in Proceedings and Committee Reports of the American Branch of the International Law Association 1959-1960, at 31; Verdross, Die Nationalisierung Nederlandischer Unternechmungen in Indonesien Im Lichte Des Volkerrects, 6 Netherlands Int'l L.Rev. 278 (1959). See also The Oscar Chinn Case, P.C.I.J. ser. A/B No. 63 (1934), 3 Hudson, World Court Reports 416, 438. Certain circumstances may exist which would permit a state to treat all aliens differently from its own citizens, but those circumstances are not present in this case. See Restatement, Foreign Relations Law of the United States 170, comment a (Proposed Official Draft, 1962).
 
 
 83
 Since the Cuban decree of expropriation not only failed to provide adequate compensation but also involved a retaliatory purpose and a discrimination against United States nationals, we hold that the decree was in violation of international law.
 
 
 84
 But that is not the end of the matter. We must consider whether the one whose property has been thus expropriated has no recourse except against the expropriator to obtain the just compensation not paid to him, or whether he may attack in the courts of the United States the validity of the expropriator's title. Compare Domke, Foreign Nationalizations, 55 Am.J.Int'l L. 585, 610-15 (1961), and Wortley, Indonesian Nationalization Measures-- an Intervention, id. at 680, with Baade, Indonesian Nationalization Measures Before Foreign Courts-- A Reply, 54 Am.J.Int'l L. 801 (1960). If the appellant's title was not rendered void, Farr, Whitlock was guilty of conversion of the bills of lading and the proceeds of the sale even though C.A.V. has not been compensated for the taking. It has been argued that the wrong under international standards is not in the taking but in the failure to pay compensation for the taking. It has been pointed out, moreover, that international tribunals have never granted restitution of the property taken. Therefore, the argument runs, the expropriator possesses good title to the property seized subject to a duty to pay damages for the injury caused. But international tribunals are not the sole custodians of international law. As we stated earlier in this opinion, municipal courts also play a part in the development of that body of law. See Coerper, The Act of State Doctrine in the Light of the Sabbatino Case, 56 Am.J.Int'l L. 143, 147 (1962); Falk, supra at 2. Furthermore, municipal courts are competent to give a restitutory remedy. In fact, the New York court which holds the proceeds from the sale of sugar involved in the present case is in such a position. We need not at present go into the question whether the granting of this type of remedy is a feature of international law or of domestic law. But we do suggest that the failure of an international tribunal to give a remedy of this tupe results from the inability of that kind of court to enforce its awards and is not a result of the dictates of substantive international law principles.[15]
 
 
 85
 Refusal by municipal courts of one sovereignty to sanction the action of a foreign state done contrary to the law of nations will often be the only deterrent to such violations. More important, the only relief open to persons injured by a confiscation will often be the invalidation of the confiscating country's title to the confiscated goods by decree of a court of another country. See Note, The Castro Government in American Courts: Sovereign Immunity and the Act of State Doctrine, 75 Harv.L.Rev. 1607, 1617-18 (1962). This is particularly true in the present case because Art. 6 of Law No. 851 explicitly precludes review of the confiscation by the Cuban courts. And no aid appears to be available through diplomatic channels to the injured parties. Therefore, we conclude that, since the Cuban decree violated international law, the appellant's title is invalid and the district court was correct in dismissing the complaint.[16]
 
 
 86
 Judgment affirmed.
 
 
 
 [1]
 N.Y.Civ.Prac.Act, 977-b provides in pertinent part:
 '977-b. Receivers to liquidate local assets of foreign corporations. , 1. An action may be instituted in the supreme court for the appointment of a receiver of the assets in this state of a foreign corporation, whenever such foreign corporation has assets or property of any kind whatsoever, tangible or intangible, within the state of New York, and (a) it has heretofore been or is hereafter dissolved, liquidated or nationalized * * *.'
 
 
 [2]
 It is not clear whether Societe Generale on August 26 presented documents to Farr, Whitlock before or after C.A.V.'s warning to Farr, Whitlock on that day
 
 
 [3]
 This motion was subsequently denied by the New York court. See Schwartz v. Compania Azucarera Vertientes-Camaguey de Cuba, 12 A.D.2d 506, 207 N.Y.S.2d 288 (1960)
 
 
 [4]
 Since Farr, Whitlock has an indemnification agreement with C.A.V., it is unlikely that Farr, Whitlock will suffer a double liability
 
 
 [5]
 We assume that the district court below was correct in concluding that C.A.V. had an interest in the sugar on the date of the expropriation decree and that the sugar was in Cuban territorial waters on that date
 
 
 [6]
 The act of state doctrine appears to be well established among British courts. See Blad v. Bamfield, 3 Swans. 604, 36 Eng.Rep. 992 (Ch. 1674); A. M. Luther v. James Sagor & Co., (1921) 3 K.B. 532 (C.A.); Princess Paley Olga v. Weisz, (1929) 1 K.B. 718 (C.A.); Re, Foreign Confiscations in Anglo-American Law 128-40 (1951). *
 Elsewhere, however, courts have been more willing to inquire into the legality of steps taken by foreign sovereigns. Anglo-Iranian Oil Co. v. S.U.P.O.R. Co., Civil Court of Rome, Sept. 13, 1954, (1955) Foro Italiano I. 256, (1955) Int'l L.Rep. 23, 49 Am.J.Int'l L. 259 (1955). Compare Societe Potasas Ibericas v. Black, Supreme Court (France), March 14, 1939, (1939) Dalloz I. 257, (1938-1940) Ann.Dig. 152 (No. 54); Union des Republiques Socialistes Sovietiques v. Intendant General Bourgeois EsQualite et Societe La Ropit, Supreme Court (France), March 5, 1928, Sirey I. 217, (1927-1928) Ann.Dig. 67 (No. 43); and Volatron v. Moulin, Court of Appeal of Aix, March 25, 1939, (1939) Dalloz I. 329, (1938-1940) Ann.Dig. 24 (No. 10), with Societe Hardmuth, Court of Appeal of Paris, Dec. 2, 1950, 44 Rev.Cr.Dr.Int.Priv. 501 (1955); De Keller v. Maison de la Pensee Francaise, Tribunal of La Seine, July 12, 1954, 44 Rev.Cr.Dr.Int.Priv. 503 (1955), (1954) Int'l L.Rep. 21, 49 Am.J.Int'l L. 585 (1955); Martin v. Banque d'Espagne, Supreme Court (France), Nov. 3, 1952, 42 Rev.Cr.Dr.Int.Priv. 425 (1953), (1952) Int'l L.Rep. 202 (No. 42); Larrasquitu et l'Etat Espagnol v. Societe Cementos Rezola, Court of Appeal of Poitiers, Dec. 20, 1937, (1938) Sirey III. 68, (1935-1937) Ann.Dig. 196 (No. 70). Compare Prince Dabischa-Kotromaniez v. Societe Lepke, Tribunal of Berlin, Nov. 1, 1928, 56 Clunet 184 (1929), with Domke, Indonesian Nationalization Measures Before Foreign Courts, 54 Am.J.Int'l L. 305, 318-19 (1960). Compare Senembah Mattschappij N.V. v. Bepublick Indonesie Bank Indonesia and De Twentsche Bank N.V., District Court of Appeals of Amsterdam, reported in Domke, supra at 307-08, with United States of Mexico v. Batafsche Petroleum Maatschappij, District Court of Middleburg, Aug. 2, 1938 (1938) W. & N.J. No. 790, (1919-1942) Ann.Dig. 16 (No. 7); Petroservice & Credit Minier Franco-Roumain v. El Aguila, Court of Appeals of The Hague, Dec. 4, 1939, (1939) W. & N.J. No. 115, aff'd on other grounds, Feb. 7, 1941 (1941) W. & N.J., (1919-1942) Ann.Dig. 17; and Dairs et Cy. v. El Aguila, District Court of Rotterdam, July 31, 1939, (1939 W. & N.J. No. 747, (1919-1942) Ann.Dig 19. But see Propetrol, Petroservice, et Petrolet v. Compania Mexicano de Petroleo, Civil Tribunal of Antwerp, Feb. 21, 1939, (1939) Belgique Judicaire II. 12, (1938-1940) Ann.Dig. 25 (No. 11); Davis et Cie v. Compania de Petroleo, Court of Appeal of Rotterdam, 41 Bull.Inst.Jur.Int. 256 (1939), (1938-1940) Ann.Dig. 25 (No. 12); Hungarian Soviet Government, Supreme Court of Austria, Oct. 31, 1922 (Ob.I. 1055/22), (1922) 4 E.O.G.Z. 274 (No. 10), (1919-1922) Ann.Dig. 56 (No. 31).
 
 
 *
 But see Anglo-Iranian Oil Co. v. Joffrate, (1953) Int'l L.Rep. 316, 47 Am.J.Int'l L. 325 (Supreme Court of Aden); Fawcett, supra note 7, at 375
 
 
 [7]
 The Justice stated:
 'It is a contradiction in terms to say that within its jurisdiction it is unlawful to persuade a sovereign power to bring about a result that it declares by its conduct to be desirable and proper. It does not, and foreign courts cannot, admit that the influences were improper or the results bad. It makes the persuasion lawful by its own act. The very meaning of sovereignty is that the decree of the sovereign makes law.' (213 U.S. at 358, 29 S.Ct. 511).
 
 
 [8]
 Another Supreme Court decision should be mentioned in this respext, Shapleigh v. Mier, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937). That case involved a dispute over title to a tract of land which had formerly been part of Mexico but which had become part of the United States as a result of a change in the course of the Rio Grande River. While under its sovereignty the Mexican state of Chihuahua had expropriated the land in question. At the outset of its opinion in Shapleigh the Supreme Court stated:
 'The question is not here whether the proceeding was so conducted as to be a wrong to our nationals under the doctrines of international law, though valid under the law of the situs of the land. For wrongs of that order the remedy to be followed is along the channels of diplomacy.' (299 U.S. at 471, 57 S.Ct. 261).
 The Court found it unnecessary to decide whether it could examine the validity of the expropriation under Mexican law because the plaintiff had failed to establish what that law was on the point at issue.
 
 
 [9]
 If there had been adequate compensation for the seizure, regardless of the other circumstances surrounding the expropriations, it would be very difficult to find any violation of international law
 
 
 [10]
 E.g., Note of August 22, 1938, to Mexico in 3 Hackworth Int'l Law 658-59 (1942); Note of July 21, 1938, to Mexico in 3 Hackworth, op. cit. supra at 656; Note of April 3, 1940, to Mexico in 3 Hackworth, op. cit. supra at 662; Note of August 28, 1953, to Guatemala in 29 Dep't State Bull. 357 at 359 (1953)
 
 
 [11]
 E.g., Chorzow Factory Case (Indemnity), P.C.I.J. Judgment No. 13, September 13, 1928, ser. A. No. 17, 1 Hudson, World Court Reports 646, 677; German Interest in Polish Upper Silesia (Merits), P.C.I.J. Judgment No. 7, May 25, 1926, ser. A., No. 7, 1 Hudson, World Court Reports 510, 523-24; Norwegian Shipowners' Claims (Norway/United States), 1 U.N.Rep.Int'l Arb.Awards, 307 334 (Perm.Ct.Arb.1921); Arabian-American Oil Company v. Saudi Arabia, Award of Arbitral Tribunal, Geneva, 1956, at 61, 101-02, 109, 127, portions of award quoted in 6 Netherlands Int'l L.Rev. 233-34 (1959); Marguerite de Joly de Sabla (United States/Panama), 6 U.N.Rep.Int'l Arb.Awards 358, 366 (1933); Arbitral Award Between Portugal and Germany, June 30, 1930, 2 U.N.Rep. Int'l Arb. Awards 1035, 1039 (1930); Shufeldt Claim (United States/Guatemala), 2 U.N.Rep. Int'l Arb.Awards 1079, 1095 (1930); Affaire Goldenberg (Germany/Rumania), 2 U.N.Rep. Int'l Arb. Awards 901, 909 (1928); Spanish Zone of Morocco Case (Great Britain/spain), 2 U.N.Rep.Int'l Arb.Awards 615, 647 (1925); Landreau Claim (United States/Peru), 1 U.N.Rep.Int'l Arb. Awards 347, 365 (1921); Selwyn's Case (United States/Venezuela), Ralston, Venezuelan Arbitrations of 1903, at 322 (1904)
 
 
 [12]
 See Restatement, Foreign Relations Law of the United States, 190, comment a (Proposed Official Draft, 1962); Anderson, Title to Confiscated Foreign Property, 20 Am.J.Int'l L. 528-29 (1926);-- Basis of the Law Against Confiscating Foreign-Owned Property, 21 Am.J.Int'l L. 525 (1927); Baxter & Sohn, Convention on State Responsibility, art. 10 (Draft No. 12, 1961); Bindschedler, Verstaatlichungmassnahmen und Entschadigungspflicht nach Volkerrecht 111 (1950); Doman, Postwar Nationalization of Foreign Property in Europe, 48 Colum.L.Rev. 1125, 1130-31 (1948);-- Compensation for Nationalized Property in Post-war Europe, 3 Int'l L.Q. 323 (1950); Domke, Indonesian Nationalization Measures Before Foreign Courts, 54 Am.J.Int'l L. 305 (1960); Fachiri, Expropriation and International Law, 6 Brit.Yb.Int'l L. 150 (1925); International Law and the Property of Aliens, 10 Brit.Yb.Int'l L. 32 (1929); Fauchille & Sibert, 32 Revue Generale de Droit Int'l Public 5, 22 (1925); LaLai Agraire Lithuanienne; Fawcett, Some Foreign Effects of Nationalization of Property, 27 Brit.Yb.Int'l L. 355 (1950); Friedmann, Some Impacts of Social Organization on International Law, 50 Am.J.Int'l L. 475, 505 (1956); 1 Hyde, International Law Chiefly as Interpreted and Applied by the United States 710-25 (2d rev. ed. 1947); Kaufman, Regles Generales du Droit de la Paix, 54 Hague Recueil 313, 429 (1935); Kunz, The Mexican Expropriations, 17 N.Y.U.L.Rev. 327, 344 (1940); Peselj, International Aspects of the Recent Yugoslav Nationalization Law, 53 Am.J.Int'l L. 428 (1959); Rado, Czechoslovak Nationalization Decrees; Some International Aspects, 41 Am.J.Int'l L. 795 (1947); Re, The Nationalization of Foreign-Owned Property, 36 Minn.L.Rev. 323, 328 (1952); Scelle, 2 Precis de droit des gens 113 (1934); Scheuner in Report of 48th Conference of the Int'l Law Association, 164 (1958); Schindler, Besitzen konfiskatorische Gesetze ausserterritoriale Wirkung?, 3 Schweizerisches Jahrbuch fur Internationales Recht 65, 94 (1946); 1 Schwarzenberger, International Law 205 (3d ed. 1957); Schwebel in Report of 48th Conference of the Int'l Law Association 150 (1958); Verdross, Die Nationalisierung Niederlandischer Unternehmungen in Indonesian im Lichte des Volkerrects, 6 Netherlands Int'l L.Rev. 278 (1959); Weiss-Tessbach in Report of 48th Conference of the Int'l Law Association 179-80 (1958); 2 Whiteman, Damages in International Law 1386 (1937); Wortley, Observations on the Public and Private International Law Relating to Expropriation, 5 Am.J.Comp.L. 577, 591 (1956). See generally Wortley, Expropriation in Public International Law 33-36 (1959)
 
 
 [13]
 Position of Latin American states. The rule stated in this Section is questioned by some states, especially in Latin America. Not only do they maintain the general position, explained in Comment a to 169, that aliens are entitled to no better treatment than nationals, but they have insisted specifically that international law imposes no duty to pay compensation when property is taken pursuant to a general program of social or economic reform. See, e.g., Mexican Minister of Foreign Affairs to Secretary of State of the United States, August 3, 1938, 3 Hackworth, Digest of International Law, 657 (1942)
 
 
 [190]
 Reporters' Notes
 See also U.N.Gen.Ass.Off.Rec. 7th Sess., 2d Comm. 286 (1952) (remarks of representative of Iran); id. at 287 (remarks of representative of Mexico); see generally Brandon, Nationalization Before the United Nations, Fifth International Conference of the Legal Profession 38 (1954).
 
 
 [14]
 The government and the Legislative Poer Law No. 851 states as follows:
 'WHEREAS, the attitude assumed by the government and the Legislative Power of the United States of North America, which constitutes an aggression, for political purposes, against the basic interests of the Cuban economy, as recently evidenced by the Amendment to the Sugar Act just enacted by the United States Congress at the request of the Chief Executive of that country, whereby exceptional powers are conferred upon the President of the United States to reduce the participation of Cuban sugars in the American sugar market as a threat of political action against Cuba, forces the Revolutionary Government to adopt, without hesitation, all and whatever measures it may deem appropriate or desirable for the due defense of the national sovereignty and protection of our economic development process.'
 
 
 [15]
 This court does not hope to resolve this legalistic analogue to the dispute over whether the chicken or the egg came first. If one believes legal rights exist separate from and prior to the existence of legal remedies, he may interpret our holding to mean that we have recognized an international wrong and have then fashioned an appropriate remedy. If, on the other hand, the reader believes legal rights cannot exist in the absence of legal remedies, he is free to interpret our words as meaning that since municipal courts can grant a remedy which divests an international title, the appellant's title is invalid
 
 
 [16]
 We mention one further problem related to this case which we find unnecessary to settle but which may arise to torment some future court with a case similar to the present one. That problem is whether the law governing this case involves elements of federal law or whether the case is governed solely by New York law. Cf. Bergman v. De Sieyes, 170 F.2d 360 (2 Cir. 1948). It has been said that the act of state doctrine is part of the law of conflict of laws. If that is so, it would seem that under the rule in Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), it is New York law which we are applying. On the other hand, certain cases have indicated that international law is part of the body of federal law. See, e.g., The Lusitania, 251 F. 715, 732 (S.D.N.Y.1918). Perhaps Erie R.R. v. Tompkins has changed the rule in these latterly mentioned cases. But see 1 Oppenheim, International Law 41 n. 4 (8th ed. 1955). For our purposes here we do not have to resolve these questions because it appears to us that a New York court would reach the same result we reach. Cf. Frenkel & Co. v. L'Urbaine Fire Ins. Co., 251 N.Y. 243, 167 N.E. 430, 65 A.L.R. 1490 (1929) (alternative holding); Fred S. James & Co. v. Second Russian Ins. Co., 239 N.Y. 248, 146 N.E. 369, 37 A.L.R. 720 (1925); Sulyok v. Penzintezeti Kozpont Budapest, 279 App.Div. 528, 111 N.Y.S.2d 75, modified on other grounds, 304 N.Y. 704, 107 N.E.2d 604 (1952) (per curiam); Schwartz v. Compania Azucarera Vertientes-Camaguey De Cuba, 208 N.Y.S.2d 833 (Sup.Ct.1960). See also Falk, supra at 11